## Virginia Capital Bank

### v.

## The Aetna Casualty & Surety Company

Record No. 821629

April 25, 1986

Present: All the Justices

*Robert D. Perrow (Wallerstein, Goode & Dobbins*, on brief), for appellant.

*John W. Burke, III (Henry H. McVey, III; McGuire, Woods & Battle*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

The dispositive question in this appeal is whether a bank suffered a loss covered under an insurance policy called a "banker's blanket bond" as a result of the fraudulent alteration of a note. Virginia Capital Bank (Bank) brought this action against the Aetna Casualty & Surety Company (Aetna), alleging that the Bank had sustained a loss by reason of the fraudulent alteration of a promissory note, that Aetna had insured the Bank against such losses, and that Aetna had rejected the Bank's claim for reimbursement under the policy. Aetna denied that the Bank had suffered a covered loss.

After considering the pleadings, discovery, an affidavit by the maker of the note, memoranda, and arguments, the trial court entered summary judgment in Aetna's favor. The court concluded that the note, although altered without the consent of the maker, was nevertheless enforceable by the Bank in its altered form as a matter of law. The court therefore held that the Bank's loss fell outside the coverage of Aetna's policy because the loss did not result from the alteration, but rather was caused by the insolvency of the maker and endorser of the note. We granted the Bank an appeal.

During the relevant period of time, Aetna covered the Bank under a "banker's blanket bond" which provided, in pertinent part:

> The Underwriter, in consideration of an agreed premium . . . agrees . . . to indemnify and hold harmless the Insured for:

> (E) Loss (1) through the Insured's having, in good faith and in the course of business, . . . either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been . . . (b) raised or otherwise altered . . . .

Paul M. Tibbs, trading as Paul's Auto Sales, had a course of dealing, extending over a 22-year period, with the Bank and with James K. Mathews, president of Mathews General Insurance Corporation. Tibbs would purchase business insurance through Mathews and borrow money from the Bank to finance the premiums. Tibbs customarily signed, in blank, promissory notes on the Bank's forms and delivered them to Mathews. When Mathews ascertained the correct amount of the premiums and interest, he would fill in the notes, with Tibbs' authority, and deliver them to the Bank. The Bank would then advance the money for the premiums to Mathews and Tibbs would pay the notes when due. This arrangement, based on Tibbs' trust of Mathews, worked well from 1958 to 1980.

The Bank's pleadings, supported by Tibbs' affidavit, show that in March 1980 Tibbs executed a note in blank on the Bank's form and delivered it to Mathews according to the usual custom. Mathews told Tibbs that the note would cover a premium of about $960.00, and Tibbs executed it on that understanding. Instead, without Tibbs' knowledge, Mathews filled in the note for a principal amount of $9,600.00, plus interest, for a total of $10,296.00. Mathews added the endorsement of his corporation, presented the note to the Bank and received the loan proceeds.

Tibbs made payments on the note, but then realized that they were excessive and refused to make further payments. He informed the Bank that the note had been completed in its present

form without his knowledge and consent and that Mathews had not procured any insurance for him with the loan proceeds. The note has a present unpaid principal balance of $7,559.61. It is undisputed that the Bank gave value for the note and accepted it in good faith, in the regular course of business, without notice of any defense. Thus, the Bank is a holder in due course. Code § 8.3-302.

The Bank argues that the note was "raised or otherwise altered" within clause (E)(1)(b) of Aetna's "banker's blanket bond." Code § 8.3-407 provides, in pertinent part:

> (1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
> * * *
> (b) an incomplete instrument, by completing it otherwise than as authorized . . .

Thus, says the Bank, the unauthorized completion of the note "is an alteration within the ambit of clause (E)." Further, the Bank contends, citing *Citizens Bank of Oregon* v. *American Insurance Co.*, 289 F. Supp. 211 (D. Ore. 1968), the loss occurred when the money was paid out by the Bank in reliance on the altered note, not when the maker refused or failed to pay the balance.

Aetna contends that the alteration of the note is immaterial to the Bank's loss because, under Virginia law, the Bank has the clear right to enforce the note according to its terms. The Bank is a holder in due course, and Code § 8.3-407(3) provides: "when an incomplete instrument has been completed [a holder in due course] may enforce it as completed." The Official Comment to that section states:

> Where blanks are filled or an incomplete instrument is otherwise completed, this subsection follows the original Section 14 in placing the loss upon the party who left the instrument incomplete and permitting the holder to enforce it in its complete form.

Thus, says Aetna, in this situation the "law allocates the risk of loss by providing that as between the maker and the holder in due course, the loss falls on the maker." Aetna argues that because Tibbs (as well as Mathews General Insurance Corporation, which endorsed the note) are both fully liable to the Bank on the note in

its present form, any loss sustained by the Bank arose solely from the Bank's erroneous business judgment in extending credit to Tibbs and Mathews, and such ordinary business risks are not within Aetna's coverage.

The Bank responds that it purchased Aetna's insurance to protect itself from the consequences of fraudulent alteration, and not to "buy a lawsuit." The Bank argues that Aetna is bound by its contract to indemnify the Bank and should undertake the burden of enforcing the note as the Bank's subrogee.

██ Code § 8.3-406 provides, in pertinent part: "Any person who by his negligence substantially contributes to a material alteration of the instrument . . . is precluded from asserting the alteration . . . against a holder in due course. . . ." The Bank contends that because the enforceability of the note depends upon the factual issue of Tibbs' negligence, which in view of the long history of dealings between the parties could not be resolved as a matter of law, the trial court erred in granting summary judgment. We do not agree. Although the enforceability of the note might be established by proof of the maker's negligence under Code § 8.3-406, Code § 8.3-407(3) makes the note enforceable against the maker as a matter of law: "A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed."[1] Thus, the court did not err in resolving the matter as a pure question of law, cognizable on Aetna's motion for summary judgment.

██ Under Code § 8.3-407(3), as under our earlier cases decided under the former Negotiable Instruments Law, see Early v. Citizens Bank, 173 Va. 436, 438, 3 S.E. 2d 167, 168-69 (1939); American Bank v. McComb, 105 Va. 473, 475, 54 S.E. 14, 15 (1906); § 5686, Code of 1919, the Bank had the right to enforce the note in its present form against the maker and the endorser for the full amount filled in.[2]

---

[1] We construe the term "subsequent holder in due course," as used in this section, to refer to one who takes the instrument subsequent to its alteration, rather than a holder subsequent to the first. A payee may be a holder in due course, Code § 8.3-302(2), and for the purposes of § 8.3-407(3) may also be a "subsequent holder in due course." See Official Comment to § 8.3-302(2), examples d. and f.

[2] Aetna correctly points out that the U.C.C. contemplates two different varieties of alteration, which would have opposite consequences in the context of this case. If the maker had completed the note for $960.00 before delivering it to Mathews, and the note had thereafter been altered by raising it to a higher figure without the maker's authority, then

 In light of the foregoing, we examine Aetna's contract insuring the Bank. Aetna is obligated to indemnify the Bank against [1] "loss, [2] through the Insured's having, in good faith and in the course of business . . . given any value . . . upon any . . . written instruments which prove to have been [3] raised or otherwise altered." Because the note is enforceable by the Bank, we do not agree with the Bank's contention that it suffered a "loss" within the terms of the policy at the time it disbursed the loan proceeds in reliance on the altered note. No "loss" is incurred by paying value for a valid and enforceable instrument.

 If the Bank should ultimately fail to collect the note, its loss would arise from the maker's insolvency or other cause unrelated to the enforceability of the note. Such a loss would not be caused by the alteration, and thus would not be incurred "through the Insured's having . . . given any value . . . on the faith of . . . written instruments which prove to have been . . . raised or otherwise altered." In *St. Paul Fire & Marine Ins. Co.* v. *State Bank of Salem*, 412 N.E.2d 103 (Ct. App. Ind. 1980), the court construed identical language in a "banker's blanket bond" in accordance with the views expressed above: "loss through" an altered instrument means "loss due to an alteration." *Id.* at 113. Thus, even if the Bank's efforts to enforce the note should prove unavailing, its loss would not be due to the alteration, but rather would be the product of the ordinary business risks to which all lenders are subject. Losses of the latter kind are outside the coverage of the "banker's blanket bond" involved here.

Finding no error in the trial court's ruling, we will affirm the judgment.

*Affirmed.*

---

the first clause of § 8.3-407(3) would apply, and the Bank could only enforce the note "according to its original tenor," i.e. for $960.00. But where the note was delivered in blank, as here, the second clause of § 8.3-407(3) applies; an "incomplete instrument has been completed." This, too, is an "alteration," as noted above, but the consequence differs; in such a case the holder may enforce the note "as completed."